UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

JOSEPH CACERES,

                    Plaintiff,            06 Civ. 1558 (JGK)

          - against -                     OPINION AND ORDER

PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, et al.,

                    Defendants.
────────────────────────────────────

JOHN G. KOELTL, District Judge:

        This dispute arises from the arrest, detention, and alleged

strip-search of the plaintiff, Joseph Caceres.  The plaintiff, a

bridge painter employed by a contractor working for the

defendant The Port Authority of New York and New Jersey ("Port

Authority"), was arrested on August 4, 2004 under an outstanding

warrant for "John Doe," for whom he was mistaken.  (Defendants'

Rule 56.1 Statement ¶¶ 1, 11, 17-18 ("Defts.' 56.1 Stmt.");

Plaintiff's Responsive Rule 56.1 Statement ¶¶ 1, 11, 17-18

("Pl.'s 56.1 Stmt.").)  The plaintiff commenced this action in

February 2006 against the Port Authority, Sergeant Cotrell,

Police Lieutenant Sangiorgi, and Police Officers Malice, Lydon,

Barry, Piniello, and Truglio.  The police officials were sued

individually and in their official capacities.

        The plaintiff brings suit under 42 U.S. § 1983, contending

that his arrest, detention, and strip-search violated his rights

under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. (Sec.Am.Compl.¶ 1.) He also brings suit under state law. (Sec.Am.Compl.¶ 1.)

The defendants move for summary judgment, arguing that the plaintiff has failed to establish the requisite elements of either the § 1983 claims or the supplemental state claims. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

For the reasons set forth below, the defendants' motion for summary judgment is granted in part, and denied in part.


I

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P' ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this

point to issue-finding; it does not extend to issue-resolution."
Gallo, 22 F.3d at 1224. The moving party bears the initial
burden of informing the district court of the basis for its
motion and identifying the matter that it believes demonstrates
the absence of a genuine issue of material fact. Celotex, 477
U.S. at 323. The substantive law governing the case will
identify those facts that are material, and "[o]nly disputes
over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary
judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party. See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing
United States v. Diebold, Inc., 369 U.S. 654, 655 (1962));
Gallo, 22 F.3d at 1223. Summary judgment is improper if there is
any evidence in the record from any source from which a
reasonable inference could be drawn in favor of the nonmoving
party. See Chambers v. T .R.M. Copy Ctrs. Corp., 43 F.3d 29, 37
(2d Cir. 1994). If the moving party meets its initial burden of
showing a lack of a material issue of fact, the burden shifts to
the nonmoving party to come forward with "specific facts showing
a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).  The

nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir.1998).


II

The following facts are undisputed unless otherwise noted. The plaintiff, Joseph Caceres, was employed in August of 2004 by L&L Bridge Painting Company as a seasonal bridge painter, and was assigned to a painting job at the George Washington Bridge (the "bridge"). (Defts.' 56.1 Stmt. ¶ 1; Pl.'s 56.1 Stmt. ¶ 1.) On August 4, 2004, the plaintiff was working on the New York side of the bridge. At that time, all of the individually named defendants were employed by the Port Authority as police officers. (Defts.' 56.1 Stmt. ¶ 2; Pl.'s 56.1 Stmt. ¶ 2.)

On August 4, 2004, the plaintiff parked his car on the New York side of the bridge without a parking permit. At about 3:00 p.m., Officer Piniello recognized that the car was parked without a permit and had it towed to the impound lot on the New Jersey side of the bridge. (Defts.' 56.1 Stmt. ¶ 8; Pl.'s 56.1 Stmt. ¶ 8.) Later that day, the plaintiff arrived at the Port Authority police station on the New Jersey side of the bridge to retrieve his vehicle. Officer Lydon called the Port Authority

Central Police Desk ("CPD") to inquire whether the plaintiff had
a valid driver's license; it is disputed whether the plaintiff
actually presented a driver's license to any of the officers.
Officer Lydon gave the CPD the plaintiff's name and date of
birth. CPD performed a database search of records maintained by
the Department of Motor Vehicles, the New York State Division of
Criminal Justice Services (the "DCJS"), and the National Crime
Information Center ("NCIC"). There is some dispute as to
whether such database searches are customary: the defendants
insist that they are; the plaintiff insists that they are not.
(Defts.' 56.1 Stmt. ¶ 9; Pl.'s 56.1 Stmt. ¶ 9.)

The DCJS assigns a New York State Identification ("NYSID")
number to an individual when the DCJS receives that individual's
fingerprint and pedigree information from the arresting police
department. An NYSID number is intended to be unique to each
individual. Prior to August 4, 2004, none of the individually
named defendants had ever seen a situation where the same NYSID
number had been assigned to multiple individuals. (Defts.' 56.1
Stmt. ¶ 10; Pl.'s 56.1 Stmt. ¶ 10.)

The CPD search revealed an active warrant on a criminal
case from Bronx County, New York for felony narcotics. (Defts.'
56.1 Stmt. ¶ 11; Pl.'s 56.1 Stmt. ¶ 11.) The warrant was for a
fictionally-named John Doe, height 5 feet 8 inches, weight 160
pounds, born on September 25, 1981; the warrant was issued in

Docket No. 98X028370. John Doe's race was listed as black and
his skin as dark. (Pl.'s Ex. A.) By contrast, the plaintiff's
New York City Police Department mugshot pedigree lists the
plaintiff's height at 5 feet 7 inches, his weight at 142 pounds,
his race as white (he is in fact Hispanic), and his year of
birth as September 11, 1976. (Defts.' Ex. H.)

The CPD faxed the John Doe warrant, along with the other
results of the database search, to Officer Lydon at the bridge.
Officer Lydon gave the documents to Lt. Sangiorgi, who reviewed
them. (Defts.' 56.1 Stmt. ¶ 11; Pl.'s 56.1 Stmt. ¶ 11.) The
documents included a printout of the plaintiff's New York State
criminal history ("rap sheet"). As the plaintiff points out,
while the rap sheet lists a bench warrant issued in Docket No.
98X028370 in Bronx County on September 3, 2003, it also
indicates that there was a return on the warrant on the same
date. The rap sheet lists the name "Johnson, Lacey" as an alias
used by the plaintiff. (Defts.' Ex. F; Defts.' 56.1 Stmt. ¶ 12;
Pl.'s 56.1 Stmt. ¶ 12.)

CPD also sent to the bridge a printout from the NCIC
Interstate Identification Index Response ("NCIC Report").
(Defts.' 56.1 Stmt. ¶ 13; Pl.'s 56.1 Stmt. ¶ 13.) The report
confirmed that the plaintiff's NYSID number matched the NYSID
number on the warrant, although it also included a caveat that

there were "no exact matches" in the index for "Joseph Caceres." (Pl.'s Ex. D.)

The officers obtained a photograph of the person who had the NYSID number reflected on the warrant, and that photograph was the plaintiff's mugshot. (Defts.' Ex. H; Defts.' 56.1 Stmt. ¶ 15; Pl.'s 56.1 Stmt. ¶ 15.) The officers also took the plaintiff's fingerprints, and the FBI responded that the fingerprints were those of the plaintiff, and that the FBI identification number corresponded to the FBI number on the plaintiff's rap sheet. (Defts.' Ex. H, J; Defts.' 56.1 Stmt. ¶ 16; Pl.'s 56.1 Stmt. ¶ 16.) The plaintiff denied to the officers that he was the subject of the warrant. (Defts.' 56.1 Stmt. ¶ 15; Pl.'s 56.1 Stmt. ¶ 15.) The plaintiff also claims, although it is disputed, that he told the officers that he had been mistaken for Lacey Johnson – the true subject of the bench warrant – in the past. (Pl.'s 56.1 Stmt. ¶ 14.) Despite the plaintiff's protestations, on August 4, 2008, the officers at the bridge did not request a photograph of the subject of the bench warrant in Docket No. 98X028370. (Defts.' 56.1 Stmt. ¶ 15; Pl.'s 56.1 Stmt. ¶ 15.)

Lt. Sangiorgi contacted the Bergen County Municipal Court, and Bergen County Justice Robert Tessaro came to the Port Authority police facility at the bridge to arraign the plaintiff, on the basis of the warrant, for fleeing from

justice.  (Defts.' 56.1 Stmt. ¶ 20; Pl.'s 56.1 Stmt. ¶ 20.)
There is some dispute as to the details of the arraignment.  The
defendants allege that Justice Tessaro reviewed all of the
documents received at the bridge, and discussed the
investigation with Officers Lydon and Barry and Lt. Sangiorgi;
the defendants also characterize the plaintiff as remaining
voluntarily silent about not being the proper subject of the
warrant.  (Defts.' 56.1 Stmt. ¶ 20.)  The plaintiff alleges that
Justice Tessaro barely discussed the investigation with the
officers, that he may not have reviewed the documents in detail,
and that the plaintiff was not allowed to speak.  (Pl.'s 56.1
Stmt. ¶ 20.)

Following his arraignment, the plaintiff was placed in a
holding facility at the bridge.  Officer Truglio was instructed
to monitor the plaintiff.  (Defts.' 56.1 Stmt. ¶ 19; Pl.'s 56.1
Stmt. ¶ 19.)  The plaintiff alleges that after about four hours
in the holding cell, he was strip-searched; the defendants deny
the allegation.  (Defts.' 56.1 Stmt. ¶ 21; Pl.'s 56.1 Stmt. ¶
21.)

The plaintiff was held at Bergen County Corrections until
August 6, 2004.  (Defts.' 56.1 Stmt. ¶¶ 22, 29; Pl.'s 56.1 Stmt.
¶¶ 22, 29.)  On that day, the plaintiff's father came to the
Port Authority police station to seek the plaintiff's release.
(Defts.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Stmt. ¶ 23.)  The

plaintiff's father testified that he urged the police to obtain his son's mugshot and said that it would come back with a different face.  He said that he waited for thirteen hours and said he would not leave until his son was released.  (Defts.' Ex. D at 63.)  Lieutenant Sangiorgi dispatched Officer Malice to the 33rd Precinct in Manhattan, purportedly to see if there were any additional bases the New York Police Department ("NYPD") could access to provide more information about the subject of the warrant.  (Defts.' 56.1 Stmt. ¶ 24.)  The purpose of this trip to the 33rd Precinct is disputed by the plaintiff, who claims it was meant to cover up the fact that Lieutenant Sangiorgi could have obtained additional information on the subject of the warrant – especially, Lacey Johnson's mugshot photograph – on August 4, 2004, by fax request.  (Pl.'s 56.1 Stmt. ¶ 24.)

An NYPD detective used a database called "PIMS" to input each individual arrest number of the plaintiff's rap sheet and produce the corresponding arrest photographs.  (Defts.' 56.1 Stmt. ¶ 26; Pl.'s 56.1 Stmt. ¶ 26.)  One photograph, corresponding to the Bronx County arrest that ultimately led to the issuance of the warrant in Docket No. 98X028370, depicted an individual named Lacey Johnson, rather than the plaintiff.  (Defts.' 56.1 Stmt. ¶ 27; Pl.'s 56.1 Stmt. ¶ 27.)  The information that accompanied the arrest photograph of Lacey

Johnson included the same NYSID number listed on the bench warrant, on the plaintiff's rap sheet, on the photograph emailed from NYPD to the bridge, and on the FBI confirmation of the plaintiff's identity. The Lacey Johnson arrest photograph also listed Joseph Caceres as a known alias for Lacey Johnson. (Defts.' 56.1 Stmt. ¶ 28; Pl.'s 56.1 Stmt. ¶ 28.)

The plaintiff was released later that day. (Defts.' 56.1 Stmt. ¶ 29; Pl.'s 56.1 Stmt. ¶ 29.)


                              III

The defendants argue that Officers Pinello, Truglio, Cottrell, and Malice are entitled to summary judgment because there is no evidence that they were personally involved in the alleged violations of the plaintiff's rights.

As to Officers Pinello, Truglio, and Cottrell, the plaintiff does not respond to this argument, nor does he present any evidence of personal involvement on the part of these defendants. Summary judgment is therefore granted dismissing all of the claims against these three defendants. See Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) ("Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat

summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.").

The only evidence against Officer Malice is that he went to the NYPD on August 6, 2004 to retrieve the photograph that led to the release of the plaintiff. There is no evidence of Officer Malice's personal involvement in any of the plaintiff's claims. While the plaintiff alleges that there is a handwritten note referring to Officer Malice on the bench warrant, no such note is apparent. (Pl.'s Ex. A.) Even if it were, it would be insufficient evidence of personal involvement: anyone could have made the note at any time, and it is unclear why such a notation would have been incriminating at all. It is undisputed that Officer Malice went to the NYPD to retrieve the photograph, and there is no evidence that Officer Malice did anything else. Picking up the photograph from the NYPD did not violate any of the plaintiff's rights. For these reasons, the presence of Officer Malice's name on the warrant would be meaningless. Indeed at the argument of this motion, the plaintiff agreed to withdraw all claims against Officer Malice. Summary judgment is therefore granted dismissing all claims against Officer Malice. Hereafter, any mention of the officer defendants refers only to Officers Lydon and Barry and Lt. Sangiorgi.

The defendants argue that the officer defendants are
entitled to summary judgment on the plaintiff's § 1983 claim of
constitutional violations under the Fourth, Fifth, Eighth, and
Fourteenth Amendments, because these defendants are entitled to
qualified immunity.  At the argument of this motion, the
plaintiff agreed to withdraw any claims based on the Fifth and
Eighth Amendments, and the plaintiff's claims are thus based
solely on the alleged violations of the Fourth and Fourteenth
Amendments.

Qualified immunity shields government officials performing
discretionary functions, such as arrests, "from liability for
civil damages insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known."  Harlow v. Fitzgerald, 457
U.S. 800, 818 (1982); see, e.g., Iqbal v. Hasty, 490 F.3d 143,
152 (2d Cir. 2007).

The "threshold question" for a court required to rule on
qualified immunity is: "[t]aken in the light most favorable to
the party asserting the injury, do the facts alleged show that
the officer's conduct violated a constitutional right?"  Saucier
v. Katz, 533 U.S. 194, 201 (2001); see Baker v. McCollan, 443
U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit . .

. is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws'"). Only "if a violation could be made out on a favorable view of the parties' submissions" may a court reach the second part of the qualified immunity inquiry: whether the right violated was "clearly established." Saucier, 533 U.S. at 201. A right that is "clearly established" is one "of which a reasonable person would have known." Harlow, 457 U.S. at 818. Notwithstanding the violation of a clearly established constitutional or statutory right, in the case of an arrest an officer may still establish qualified immunity by showing either that "it was objectively reasonable for the officer to believe that probable cause existed," or that "officers of reasonable competence could disagree on whether the probable cause test was met." Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987); see also Rogers v. City of Amsterdam, 303 F.3d 155, 158 (2d Cir. 2002).

The plaintiff clearly had a constitutional right not to be arrested and detained without probable cause. See, e.g., Gerstein v. Pugh, 420 U.S. 103, 111 (1975). The first question is therefore whether that right was violated. Probable cause for an arrest exists if "at the moment the arrest was made . . . the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in

believing" that the arrestee had committed a crime.  <u>Hunter v.</u>
<u>Bryant</u>, 502 U.S. 224, 228 (1991); <u>see also</u> <u>Zellner v. Summerlin</u>,
494 F.3d 344, 371 (2d Cir. 2007).

<u>Hill v. California</u>, 401 U.S. 797 (1971), "governs the law
in cases where the person arrested turns out not to be the
person sought."  <u>United States v. Valez</u>, 796 F.2d 24, 26 (2d
Cir. 1986).  In <u>Hill</u>, the Supreme Court held that when the
police have probable cause to arrest one party, and when they
reasonably mistake a second party for the first party, then the
arrest of the second party is a valid arrest.  <u>Hill</u>, 401 U.S. at
802.  <u>Hill</u> concerned a search incident to arrest, rather than the
arrest and detention themselves, but the validity of the search
depended upon the validity of the arrest.  In <u>Hill</u>, the police
had probable cause to arrest a man named Hill.  They went to his
apartment and encountered a different man, Miller, whom they
mistook for Hill.  Miller told the police that he was not Hill,
said he was waiting for Hill, and produced identification
showing that he was Miller.  The police proceeded to search the
apartment anyway.  The Supreme Court noted that Miller "fit the
description of Hill received from various sources," and
discounted the discrepancies that Miller was two inches taller
and ten pounds heavier than Hill.  <u>Id.</u> at 803 & n.6.  The Court
also noted that Miller's explanation for his presence in the
apartment was "unconvincing," and that he denied knowledge of

14

firearms in the apartment although a pistol and ammunition were
in plain view.  Id.  The court held that the police officers had
probable cause for the arrest, dismissing Miller's protestation
and production of conflicting identity as "not uncommon" tactics
that did not eliminate the reasonableness of the officers'
belief that Miller was Hill.  Id.

However, the circumstances here differ substantially from
those in Hill.  In Hill, the arresting officers encountered
Miller when he answered the door at Hill's apartment.  They made
an understandable common-sense assumption that the person
answering the door at an apartment was the person who lived
there.  Here, no such assumption could be made: the officers
encountered the plaintiff when he voluntarily approached them at
the police station – hardly an expected tactic from the subject
of an outstanding warrant.  In Hill, the Supreme Court found
that Miller fit the description of Hill, but in this case, the
plaintiff was a different race and color from the subject of the
bench warrant, and the weight difference was twice the
difference that existed in Hill.  Moreover, in this case there
was a five year difference in age between the subject of the
warrant and the plaintiff.  Given that the plaintiff told the
officers that he was not the subject of the warrant, and given
his contention that he also told them specifically that he had

been confused with Lacey Johnson in the past, the question of probable cause is much closer here than it was in <u>Hill</u>.

Furthermore, there was corroborating evidence in <u>Hill</u> that supported probable cause – the evasive responses by Miller and the denial of the weapon that was in plain view. Here, not only did the plaintiff present himself to the police, but there are issues of fact as to whether the plaintiff provided a detailed and plausible explanation to the police that the warrant was mistakenly attributed to him while in fact it was a warrant for another person. Indeed, the plaintiff alleges that he provided the police with specifics that Lacey Johnson was the subject of the warrant and that he had been confused with Lacey Johnson in the past. The confirmatory actions that the police took – obtaining a photograph of the plaintiff and checking his fingerprints – only served to confirm that the plaintiff was who he said he was. Those actions did not confirm that the plaintiff was the subject of the warrant. When the police checked the subject of the warrant by obtaining the photograph of the subject of the warrant on August 6, they immediately discovered their mistake. However, all of the evidence, as sworn to by the plaintiff, undercut the reasonableness of a finding of probable cause on August 4 that the plaintiff was the subject of the John Doe warrant.

Johnson v. City of New York, 940 F.Supp. 631 (S.D.N.Y. 1996), provides a closer analogy to the present case.  In Johnson, another § 1983 mistaken arrest case, the police pulled over Steven Johnson ("Plaintiff Johnson") for a traffic violation, and were informed by a police dispatcher that there was an outstanding warrant for a Steven Johnson.  Although there was a four-inch height discrepancy and roughly a twenty-pound weight discrepancy between the plaintiff Johnson and Steven Johnson, the two bore the same name and shared the same race. Id. at 634.  Nevertheless, the court refused to grant summary judgment to the defendants on the ground of qualified immunity, holding that a genuine issue of fact existed concerning whether reasonable officers could disagree about whether there had been probable cause to arrest the plaintiff Johnson.  Id. at 635. The facts in this case present even greater disparities between the John Doe bench warrant and the plaintiff than the disparities that existed in the Johnson case.

    Baker v. McCollan, 443 U.S. 137 (1979), relied upon heavily by the defendants, does not suggest a different result.  In Baker, a routine warrant check at a traffic stop seemed to reveal an outstanding warrant for the plaintiff McCollan.  The police arrested and detained McCollan despite his protests of mistaken identity.  In actual fact, McCollan's brother had appropriated the plaintiff McCollan's identity when the brother

had been arrested and released on bail two months earlier, and
the brother was the true subject of the warrant.  Id. at 141.
The court held that the plaintiff had not shown that he had been
deprived of a right secured by the Constitution and laws of the
United States.  Id. at 146.  The Court found that there was no
attack on the validity of the warrant and therefore the arrest
was valid under the Fourth Amendment, and that the plaintiff's
subsequent detention for three days did not deprive him of
liberty without due process.  However, Baker is inapposite
because there, the warrant itself had a latent error that the
arresting officers could not reasonably have been expected to
detect.  The warrant contained the name of the arrestee, but the
arrestee had essentially been framed two months earlier.  In
this case, the difference between the description in the warrant
itself and the plaintiff, taken together with the alleged
specific protest of the plaintiff explaining the erroneous
nature of the bench warrant, undercuts probable cause at the
time of the arrest.[1]

---

[1] The defendants also rely on Gonzalez v. City of New York, No. 98 Civ. 6081,
2002 WL 252564 (S.D.N.Y. Feb. 21, 2002), in which the court granted summary
judgment for arresting officers who mistakenly arrested the plaintiff on a
warrant for another person.  However, in that case, before arresting the
plaintiff, the officers determined that the plaintiff's name was one of the
aliases used by the subject of the warrant, the plaintiff had the same date
of birth as the subject of the warrant, and the plaintiff's driver's license
photograph appeared to match the file photograph of the subject of the
warrant.  Id. at *5.  There was plainly more justification in the Gonzalez
case to conclude that the plaintiff in that case was the subject of the
warrant than there was to conclude that the plaintiff in this case was the
subject of the John Doe warrant.

Therefore, a genuine issue of material fact exists as to whether the police had probable cause to arrest and detain the plaintiff.

Even though it is undisputed that the constitutional right not to be arrested and detained without probable cause was clearly established at the time of the plaintiff's arrest, in the case of an arrest an officer may still establish qualified immunity by showing either that "it was objectively reasonable for the officer to believe that probable cause existed," or that "officers of reasonable competence could disagree on whether the probable cause test was met."  Robinson, 821 F.2d at 921. Nonetheless, here there exist genuine issues of material fact as to whether officers of reasonable competence could have disagreed that probable cause existed.  The plaintiff differed in race, skin color, height, weight, and date of birth from the subject of the warrant, the warrant did not name a particular subject, the officers had not obtained a photograph of the subject of the warrant, and the plaintiff called attention to the mistaken identity immediately.  Indeed, according to the plaintiff, he told the officers that he had been mistaken for the actual subject of this warrant previously.  Lt. Sangiorgi admitted at his deposition that if the plaintiff had said that he was not the subject of the warrant and had provided details – as the plaintiff claims that he did – Lt. Sangiorgi would have

sought more information before arresting the plaintiff.

(Sangiorgi Dep. at 205.) For these reasons, the officers have

not established that they are entitled to summary judgment on

the basis of qualified immunity.[2]


V

The defendants argue that the officer defendants are

entitled to summary judgment on the plaintiff's claim that they

violated § 1983 by failing to intervene to prevent a violation

of his constitutional rights.

---

[2] The defendants argue that they are entitled to qualified immunity on the state law claim of false arrest because probable cause existed. For the reasons explained in the text, the defendants are not entitled to summary judgment on qualified immunity based on the existence of probable cause, and thus the defendants are not entitled to summary judgment on the state claim of false arrest on this basis. See, e.g., Mesgleski v. Oraboni, 748 A.2d 1130, 1139 (N.J. App. Div. 2000) ("The [New Jersey Tort Claims] Act does not immunize law enforcement officials from charges of false arrest or false imprisonment. A plaintiff need not prove the lack of probable cause . . . [t]he probable cause needed to defend a false arrest action uses the objective standard of a reasonable and prudent person in like circumstances.").

It should be noted that the defendants do not rely on the determination of Justice Tessaro to support the existence of probable cause or the continued detention of the plaintiff and the Court has thus not considered what effect that determination should have.

Finally, the parties have not distinguished among the various constitutional rights asserted in arguing the defense of qualified immunity, but have focused solely on whether the officers had probable cause to arrest the plaintiff and whether reasonable officers could disagree as to whether probable cause existed. It is plain that the right to be free from arrest except on the basis of probable cause is a right arising under the Fourth Amendment applied to the states by the Fourteenth Amendment. See, e.g., Maryland v. Pringle, 540 U.S. 366, 369 (2003). The right to be free from continued detention in the absence of probable cause may implicate the right not to be deprived of liberty without due process, which would be applied against state actions under the Fourteenth Amendment. See Baker, 443 U.S. at 142-44. The plaintiff has withdrawn any reliance on any Amendment other than the Fourth and Fourteenth Amendments. The Fifth Cause of Action that alleges false arrest and unlawful imprisonment in violation of 42 U.S.C. § 1983 would survive based on the alleged violation of the Fourth and Fourteenth Amendments.

"A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). "Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability." Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 129 (2d Cir. 1997).

The defendants argue that the plaintiff fails to overcome the defense of qualified immunity for the failure to intervene claim. But "to obtain summary judgment on qualified immunity grounds in connection with a claim of failure to intercede to prevent an illegal arrest, a defendant must show that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the arrest." Ricciuti, 124 F.3d at 129. To make this showing the defendants rely upon the same argument they use to move for summary judgment on the claims for violation of constitutional rights, discussed above: there is no evidence of a constitutional violation in this case with regard to the plaintiff's arrest; therefore, there can be no duty to intervene. However, for the reasons explained above, the Court rejects that argument. Because there remain genuine issues of material fact as to whether the defendants violated the

plaintiff's constitutional rights, there also remain genuine issues of material fact as to whether the defendants had a duty to intervene. For this reason, summary judgment is denied with respect to the failure to intervene claim.

VI

The defendants argue that the Port Authority is entitled to summary judgment on the plaintiff's assertion of municipal liability under § 1983 for the failure to train employees to prevent the alleged violation of the plaintiff's constitutional rights.

"Municipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to governmental custom, policy, ordinance, regulation, or decision." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983) (citing Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978)).[3] Municipalities are not subject to liability under theories of respondeat superior, but rather theories that their policies or customs "inflict[ed] the injury upon the plaintiff." Id. "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an

_____

[3] The Port Authority is a public agency that exists under the laws of New York and New Jersey. The parties do not dispute that it is a municipality for purposes of § 1983. See Raysor v. Port Authority of New York and New Jersey, 768 F.2d 34, 38 (2d Cir. 1985).

official policy or custom that (2) causes the plaintiff to be
subjected to (3) a denial of a constitutional right." Id.
Failure to train city employees may constitute such an offending
policy or custom under limited circumstances. City of Canton v.
Harris, 489 U.S. 378, 387 (1989). Specifically, "the inadequacy
of police training may serve as the basis for § 1983 liability
only where the failure to train amounts to deliberate
indifference to the rights of persons with whom the police come
into contact." Id. at 388. To establish "[d]eliberate
indifference," a plaintiff must show that "[i] a policymaker
knows to a moral certainty that city employees will confront a
particular situation, [ii] the situation either presents the
employee with a difficult choice of the sort that training or
supervision will make less difficult or there is a history of
employees mishandling the situation, and [iii] the wrong choice
by the city employee will frequently cause the deprivation of a
citizen's constitutional rights." Wray v. City of New York, 490
F.3d 189, 195-196 (2d Cir. 2007) (quoting Walker v. City of New
York, 974 F.2d 293, 297-298 (2d Cir. 1992) (internal quotation
marks omitted)).

The defendants, pointing to Board of the County Comm'rs of
Bryan County v. Brown, 520 U.S. 397 (1997), argue that to
support a failure to train argument under § 1983, the plaintiff
must show that the city had notice of the likelihood of injury

prior to its actual occurrence.  They also argue that municipal

liability under § 1983 requires a deliberate choice to pursue

one course of action among various alternatives, relying on the

plurality opinion in Pembaur v. City of Cincinnati, 475 U.S. 469

(1986).  But the plaintiff has met both of these requirements

here, at least sufficiently to avoid summary judgment.  The

plaintiff has raised a genuine issue of material fact as to

whether the Port Authority was on notice of the likelihood of

mistaken arrests based on mistakes in the criminal justice

databases such that training was necessary to pursue obvious

discrepancies in those databases before arresting a person based

on conflicting information.  The plaintiff presented a

declaration from Walter Signorelli, a retired member of the New

York City Police Department with thirty-one years of experience,

and who held numerous senior supervisory positions within the

department.  Mr. Signorelli stated that "inaccurate information"

in one criminal justice database "is often transferred into

other databases," and that "[m]istaken identities in the

criminal justice process are not uncommon": "police officers

should be aware that errors occur when information is inputted

into other databases." (Signorelli Aff. ¶ 10.)  He also notes:

"Therefore, when discrepancies exist between the records used to

match a suspect to a warrant or when extrinsic information casts

doubt on the accuracy of the computerized records, police

officers must take further measures to confirm that a suspect is actually the person wanted." (Id.) Ignoring the possibility of such risks represents a deliberate choice. As the Court of Appeals for the Third Circuit has held: "[w]hen such a simple mistake can so obviously lead to a constitutional violation, we cannot hold that the municipality was not deliberately indifferent to the risk as a matter of law." Berg v. County of Allegheny, 219 F.3d 261, 277 (3d Cir. 2000). It is clear for the same reasons that a genuine issue of material fact exists as to whether the plaintiff's failure to train claim satisfies the three-part Wray test for deliberate indifference. Therefore the Port Authority is not entitled to summary judgment dismissing the claim against it for municipal liability for the alleged violation of the plaintiff's constitutional rights based on the claim of false arrest.


                                   VII

     The defendants argue that the officer defendants are entitled to summary judgment on the plaintiff's state law false arrest claim. Claims of false arrest under New Jersey law hinge upon whether there was probable cause for the arrest in question. See, e.g., Tarus v. Borough of Pine Hill, 916 A.2d 1036, 1050 (N.J. 2007). New Jersey courts apply the federal "totality-of-the-circumstances" test to the probable cause

requirement.  State v. Novembrino, 519 A.2d 820, 849 (N.J. 1987).  If anything, the probable cause requirement in New Jersey affords citizens "greater protection against unreasonable searches and seizures than does the fourth amendment."  Id. at 850.  Therefore the standard for probable cause in New Jersey is at least as high as the federal standard.  In light of the Court's determination that summary judgment is inappropriate on the question of whether probable cause existed under the Fourth Amendment to arrest the plaintiff, summary judgment is also inappropriate for the defendants on the state law false arrest claim.

Summary judgment is also denied with respect to the plaintiff's claim of vicarious liability for false arrest against the Port Authority.  New York and New Jersey have both waived immunity for the Port Authority from suits for false arrest.  See Raysor, 768 F.2d at 38.  Under the New Jersey Tort Claims Act, "[a] public entity is liable for injury proximately caused by an act or omission of a public employee within the scope of his employment in the same manner and to the same extent as a private individual under like circumstances." N.J.S.A.59:2-2; see also Marian v. Borough of Manasquan, 555 A.2d 699, 702 (N.J. App. Div. 1989).  Because the officers are not entitled to summary judgment dismissing the state law false arrest claim, summary judgment cannot be granted dismissing the

possible vicarious liability of the Port Authority for that
claim.


                              VIII

     The defendants argue that they are entitled to summary
judgment on the plaintiff's claim of malicious prosecution
allegedly in violation of § 1983.  The plaintiff's malicious
prosecution claim under § 1983 is governed by state law.  See,
e.g., Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994).  To
establish malicious prosecution under New Jersey law, the
plaintiff must show "(1) that the criminal action was instituted
by the defendant against the plaintiff, (2) that it was actuated
by malice, (3) that there was an absence of probable cause for
the proceeding, and (4) that it was terminated favorably to the
plaintiff."  Lind v. Schmid, 337 A.2d 365, 368 (N.J. 1975).
"The essence of the cause of action is lack of probable cause."
Id.

     The defendants argue that they are entitled to summary
judgment on this claim because the same evidence that
establishes the existence of probable cause and qualified
immunity in connection with the claims relating to the
plaintiff's arrest shows that there was probable cause for the
prosecution and that they are entitled to qualified immunity for
this claim as well.  For the same reasons that the defendants

are not entitled to summary judgment on their claim of qualified immunity in connection with the arrest, and because there are issues of fact as to whether there was probable cause for the plaintiff's arrest, summary judgment is denied to the officer defendants on the plaintiff's claim of malicious prosecution.[4]

For the reasons explained above, the Port Authority is not entitled to summary judgment with respect to its liability under § 1983 for malicious prosecution because issues of fact exist as to whether it was liable for a failure to train.[5]

IX

Defendants move for summary judgment with respect to the plaintiff's claim of a violation of § 1983 based on malicious abuse of process. Malicious abuse of process claims brought under § 1983 are governed by state law. See, e.g., Cook, 41 F.3d at 80. In New Jersey, malicious abuse of process claims must be supported by a showing that the defendant has made improper, unwarranted and perverted use of process after it has been issued. Wozniak v. Pennella, 862 A.2d 539, 549 (N.J. App.

---

[4] The plaintiff's claim of malicious prosecution under state law, and the plaintiff's claim of vicarious liability of the Port Authority for that claim, (see Sec. Am. Compl. (Twenty-First Cause of Action)), cannot be dismissed on summary judgment because there are issues of fact as to whether probable cause existed for the arrest on which the defendants rely.
[5] While the plaintiff's claim of municipal liability under § 1983 is very broad, (see Sec. Am. Compl. (Eighth Cause of Action)), at argument, the plaintiff made it clear that he is asserting municipal liability only for the alleged constitutional violations arising from the alleged false arrest and malicious prosecution.

Div. 2004). The term "process" refers to procedural methods used by a court to acquire or exercise jurisdiction over a party or specific property. See id.

Process was exercised upon the plaintiff when he was arraigned and charged on August 4, 2004 with fleeing the warrant. The plaintiff argues that this process was used in an attempt to cover up the illegality of the arrest. There is no evidence to support that allegation. The plaintiff argues that Lt. Sangiorgi dispatched Officer Malice to the 33rd Precinct on August 6, 2004 to cover up the fact that Lt. Sangiorgi appreciated that the initial arrest was wrongful. However, even that argument, for which there is no evidence, would not show that the arraignment and charging of the plaintiff was used to create any false impression. The plaintiff has not produced any evidence, besides bare assertions, that the actions of the judge were ever used to conceal the alleged illegality of the plaintiff's arrest. Therefore, no genuine issue of material fact has been raised to suggest that improper use was made of the process, and summary judgment is appropriate for all defendants on the malicious abuse of process claim under § 1983. Similarly, all defendants are entitled to summary judgment on the parallel state law claim of malicious abuse of process.

The defendants move for summary judgment on the plaintiff's claim that he was subjected to an unlawful strip search. The plaintiff argues that the strip search was unlawful under federal and state law, and the defendants do not dispute that proposition for purposes of this motion for summary judgment. There is no allegation that there was any reasonable suspicion that the plaintiff was carrying a concealed weapon or contraband. Cf. Wachtler v. County of Herkimer, 35 F.3d 77, 81 (2d Cir. 1994). Rather, the defendants assert that there is no evidence that any individual defendant actually conducted a strip search of the plaintiff, and that the plaintiff has not been able to identify the officer who allegedly conducted the strip search. Moreover, the defendants argue that a strip search of the plaintiff would have been contrary to Port Authority policy.

The plaintiff has failed to identify any specific officer who strip-searched him. There is therefore no evidence that any individual defendant was involved in a strip search of the plaintiff, and each of the defendants has denied such involvement. Because "it is well settled in [the Second] Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983,'" summary judgment must be granted to the

defendants on the federal strip search claim.  <u>Wright v. Smith</u>,
21 F.3d 496, 501 (2d Cir. 1994) (quoting <u>Moffit v. Town of
Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991)).[6]

The plaintiff's state law strip search claim takes two
forms.  The plaintiff argues that the alleged strip search was
illegal under New Jersey law as such, and that it was illegal
because it constituted an assault and battery.  These two
variations of the strip search claim are discussed in turn.

In New Jersey, the police cannot strip-search a person
arrested for an offense "other than a crime" absent probable
cause that the person "is concealing a weapon or drugs on his
body," or another exception to the statute applies.  N.J. Stat.
Ann. § 2A:161A-1.  The defendants have not asserted that they
were authorized under state law to conduct a strip search.
Rather, the individual defendants have denied performing such a
search.  Because the plaintiff has failed to identify any
particular defendant as having strip-searched him, summary
judgment must be granted to the officer defendants on the strip
search claim.  However, the plaintiff also asserts a claim of
vicarious liability against the Port Authority for the strip
search.  While the plaintiff has not adduced any evidence that

---

[6] Similarly, the plaintiff has not attempted to show that any strip search was
pursuant to any custom or practice of the Port Authority, and indeed the
evidence is to the contrary.  Therefore, the plaintiff's claim of municipal
liability against the Port Authority for this claim must be dismissed under
<u>Monell</u>.  Moreover, at argument, the plaintiff did not attempt to assert a
claim of municipal liability for the alleged strip search.

any individual defendant conducted the search, he swears under oath that the search occurred and was conducted by a Port Authority officer. The Court could not find such testimony incredible as a matter of law. On the theory of respondeat superior, the Port Authority is denied summary judgment as to the strip search, because genuine issues of material fact have been raised as to whether an agent of the Port Authority conducted a search. The Port Authority has not attempted to argue that if the search occurred, it complied with state law.

The analysis is similar for the plaintiff's assault and battery claim. In New Jersey, "any non-consensual touching is a battery." Perna v. Perrozi, 457 A.2d 431, 439 (N.J. 1983). Intentionally placing an individual in "imminent apprehension" of "a harmful or offensive contact" constitutes assault. Wiggington v. Servidio, 734 A.2d 798, 806 (N.J. App. Div. 1999). An unlawful strip search by the police could constitute an assault and battery. Because no particular defendant is identified as having conducted the strip search, the officer defendants are entitled to summary judgment on the claim of assault and battery. But because a genuine issue of material fact has been raised by the plaintiff's testimony as to whether a strip search occurred, summary judgment is denied to the Port Authority, because it can be liable on the theory of respondeat

superior for the alleged illegal strip search conducted by
municipal officers if it in fact occurred.

XI

The defendants move for summary judgment on the plaintiff's
state law claim of intentional infliction of emotional distress.
In New Jersey, this tort requires a showing that (1) the
defendant intended to inflict emotional distress or did so with
actual or constructive knowledge, (2) the defendant's conduct
was extreme and outrageous, (3) the defendant's actions caused
the plaintiff's distress, and (4) the emotional distress was
severe.  Young v. Hobart West Group, 897 A.2d 1063, 1074 (N.J.
App. Div. 2005).  The officer defendants cannot be held liable
for intentional infliction of emotional distress based on the
alleged strip search, because as mentioned above, no particular
officer is identified as conducting the search – therefore none
is alleged to be personally involved in the search.  Aside from
the alleged strip search, the plaintiff has failed to produce
evidence of conduct sufficiently "extreme and outrageous" to
constitute the intentional infliction of emotional distress.
See Buckley v. Trenton Saving Fund Soc., 544 A.2d 857, 863
(1988) (extreme and outrageous conduct is that which "go[es]
beyond all possible bounds of decency" and is "regarded as
atrocious, and utterly intolerable in a civilized community");

Cole v. Laughrey Funeral Home, 869 A.2d 457, 465 (N.J. App. Div. 2005).  Therefore, the officer defendants are entitled to summary judgment with respect to the claim of intentional infliction of emotional distress.

Under a theory of respondeat superior, as discussed above, the Port Authority may be held liable for the conduct of its municipal employees.  It is not protected, like the individual officers, by the plaintiff's failure to identify a specific offending officer in the conduct of the strip search.  Because subjecting the plaintiff to a strip search without probable cause for such an intrusive search could be considered extreme and outrageous, and because the plaintiff raises a genuine issue of material fact as to whether this occurred, the Port Authority is not entitled to summary judgment on the claim of intentional infliction of emotional distress.

XII

Finally, the defendant moves to dismiss the plaintiff's state law claim for property damage to his father's car.  For the same reason that is discussed above, the officer defendants are entitled to summary judgment on this claim because the plaintiff has failed to identify a specific officer who damaged the car.

The analysis is different for the Port Authority, because it may be found vicariously liable for the damage on a theory of respondeat superior, and therefore its liability does not depend on a particular defendant being identified by the plaintiff. The defendants argue that there is insufficient evidence of damage to the car, and that the plaintiff would need some factual basis from which to articulate the amount or extent of the alleged damage. At the summary judgment stage, the testimony of the plaintiff and his father are sufficient to establish the existence of an issue of material fact as to whether there was damage. Photographs and estimates for repair are not necessary to establish that there was in fact deliberate property damage while the car was in the custody of agents of the Port Authority. Therefore, summary judgment is denied to the Port Authority on the property damage claim.

CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, they are either moot or without merit.

Therefore, as explained above, the defendants' motion for summary judgment is **granted** in part and **denied** in part.

SO ORDERED

Dated: New York, New York
September 23, 2008

John G. Koeltl
United States District Court Judge