UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

JOSEPH CACERES,

                Plaintiff,           06 Civ. 1558 (JGK)

       - against -             <u>OPINION AND ORDER</u>

PORT AUTHORITY OF NEW YORK AND NEW
JERSEY, et al.,

              Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

      This is a case of an arrest based on mistaken identity.

      On August 4, 2004, the plaintiff, Joseph Caceres, reported to the Port Authority Police Building at the George Washington Bridge (the "Station") in order to retrieve his car, which had been towed earlier that day because it was parked illegally. At the Station, located on the New Jersey side of the Bridge, the plaintiff was mistaken by police officers employed by the Port Authority of New York and New Jersey (the "Port Authority") for the subject of an outstanding felony narcotics warrant issuing out of Bronx County, New York. The plaintiff was arrested as a fugitive from justice. The officers made the arrest after being informed by the Port Authority Central Police Desk (the "CPD") of a match in the database of criminal history records maintained by the New York State Department of Criminal Justice Services (the "DCJS") between the plaintiff's name and date of

birth and the warrant, which was for an unidentified subject, "John Doe."  The plaintiff was arrested despite protesting that he was not the subject of the warrant and despite several inconsistencies between the plaintiff's physical characteristics and those of the subject described in the warrant, including a discrepancy between the plaintiff's race and the race of the subject described in the warrant.

After the plaintiff was arrested and placed in a holding cell at the Station, the officers involved in the arrest continued to investigate whether the plaintiff was in fact the subject of the warrant.  The plaintiff remained in custody, first at the station and, following a judicial proceeding, at the Bergen County Correctional Facility, until August 6, 2004. On that date, due to information obtained by certain of the officers after being prodded into further investigation by the plaintiff's father, it became clear that the plaintiff was not the subject of the warrant on which he was being held, and the plaintiff was released from custody.

The plaintiff subsequently brought suit against the Port Authority and three police officers employed by the Port Authority who participated in his arrest and the related investigation: Lieutenant Roenzo Sangiorgi, Sergeant Michael

Barry, and Officer Michael Lydon (the "investigating officers").[1]
The plaintiff alleged claims under 42 U.S.C. § 1983 and New
Jersey State law against the Port Authority and the
investigating officers, including false arrest claims under
federal and state law against the investigating officers, a
failure to intervene claim under federal law against the
investigating officers, a failure to train claim under federal
law against the Port Authority, and false arrest, illegal strip
search, assault, and intentional infliction of emotional
distress claims under state law against the Port Authority based
on a theory of vicarious liability.[2]  After a trial lasting
approximately two weeks, the jury returned a special verdict
form finding Lieutenant Sangiorgi liable for false arrest under
42 U.S.C. § 1983 and New Jersey state law, and the Port
Authority vicariously liable for false arrest under New Jersey
state law.  The jury awarded the plaintiff $10,000 in
compensatory damages.  The jury found that Lieutenant Sangiorgii
was not liable for punitive damages.  The jury did not find the
other investigating officers liable on any claim, and did not
find Lieutenant Sangiorgi or the Port Authority liable on any
claim other than false arrest.  Following the return of the

---

[1]    The plaintiff also brought claims against four other Port Authority
police officers, but all claims against those officers were dismissed at the
summary judgment stage.
[2]    The plaintiff brought various other claims against the Port Authority
and the investigating officers, all of which were either dismissed at the
summary judgment stage or voluntarily withdrawn during trial.

special verdict form, the Court distributed to the jury a series
of special interrogatories to assist the Court in its
determination as a matter of law whether Lieutenant Sangiorgi
was entitled to qualified immunity on the false arrest claims.

At the close of the trial, after the jury had returned its
verdict and answered the special interrogatories, Lieutenant
Sangiorgi and the Port Authority (the "defendants") jointly
moved for judgment as a matter of law pursuant to Federal Rule
of Civil Procedure 50(b) to set aside the jury verdict against
them.[3]  Lieutenant Sangiorgi also moved separately for judgment
as a matter of law on the basis of qualified immunity.  The
Court reserved decision on the motions and the parties proceeded
to brief them.  The defendants now renew their respective
motions and also move in the alternative for a new trial
pursuant to Rule 59.[4]

For the reasons explained below, the defendants' joint
motion for judgment as a matter of law pursuant to Rule 50 or a

---

[3]     The defendants had also moved for judgment as a matter of law pursuant
to Fed. R. Civ. P. 50(a) before the case was submitted to the jury, and the
Court reserved ruling on the motion.  See, e.g., Exxon Shipping Co. v. Baker,
128 S. Ct. 2605, 2617 n.5 (U.S. 2008) ("A motion under Rule 50(b) is not
allowed unless the movant sought relief on similar grounds under Rule 50(a)
before the case was submitted to the jury.").

[4]     The defendants' joint motion for judgment as a matter of law pursuant
to Rule 50 or a new trial pursuant to rule 59 is a separate motion from
Lieutenant Sangiorgi's motion for judgment as a matter of law based on
qualified immunity, despite the inclusion of both motions in the same post-
trial submission.  Defense counsel makes clear that they are separate motions
(see Defts.' Br. 19), and the two motions are necessarily separate because
the Port Authority is not eligible for qualified immunity.  See Owen v. City
of Independence, Mo., 445 U.S. 622, 638 (1980).

new trial pursuant to Rule 59 is **denied**.  However, Lieutenant Sangiorgi's motion for judgment as a matter of law on the basis of qualified immunity is **granted.**

I

It is well-established that a district court should deny a Rule 50 motion unless "viewed in the light most favorable to the nonmoving party, 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154-55 (2d Cir. 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)) (alteration in original); see also SEC v. Zwick, No. 03 Civ. 2742, 2007 WL 831812, at *2 (S.D.N.Y. Mar. 12, 2007); Fowler v. N.Y. Transit Auth., No. 96 Civ. 6796, 2001 WL 83228, at *1 (S.D.N.Y. Jan. 31, 2001); Dailey v. Société Générale, 915 F. Supp. 1315, 1321 (S.D.N.Y. 1996), aff'd in relevant part, 108 F.3d 451, 457-58 (2d Cir. 1997).

A trial court considering a motion under Rule 50(b) "must view the evidence in a light most favorable to the nonmovant and grant that party every reasonable inference that the jury might have drawn in its favor." Samuels v. Air Transp. Local 504, 992 F.2d 12, 16 (2d Cir. 1993).  A jury verdict should be set aside

only when "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [where there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]." Logan v. Bennington Coll. Corp., 72 F.3d 1017, 1022 (2d Cir. 1996) (alterations in original) (internal quotation marks and citations omitted); see also Zwick, 2007 WL 831812, at *2.

In the alternative, the defendants move for a new trial pursuant to Rule 59. See Fed. R. Civ. P. 59(a). In determining whether a new trial is appropriate under Rule 59(a), a court applies a less stringent standard than on a motion for judgment as a matter of law. See Manley v. Ambase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003); Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987). "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley, 337 F.3d at 245 (internal quotations and citation omitted).

II

There was sufficient evidence introduced at trial from which the jury could reasonably have found as follows.

On August 4, 2004, the plaintiff, who worked as a seasonal bridge painter at the George Washington Bridge (the "Bridge"), arrived late to work and parked his car illegally. (Tr. 69-70, 77-78.)  The Port Authority towed the plaintiff's car to the Station on the New Jersey side of the Bridge. (Tr. 80.)  At approximately 4:30 p.m., the plaintiff reported to the station to retrieve his car. (Tr. 81, 249.)  He presented his driver's license and employee photo identification card to Officer Lydon. (Tr. 83.)  The card reflected that the plaintiff was a Port Authority contract employee. (Tr. 83, 250.)  The plaintiff explained to Officer Lydon that he worked as a painter at the Bridge and that his car had been towed. (Tr. 83.)  The plaintiff was cooperative and polite and did not seem nervous. (Tr. 249-50.)  Officer Lydon told the plaintiff that the plaintiff's car would be retrieved "right away." (Tr. 83.)

In the course of arranging for the release of the plaintiff's car, Officer Lydon communicated the plaintiff's name and date of birth over the phone to CPD, the communications hub and headquarters of the Port Authority Police Department (Tr. 240-41), in order to determine whether the plaintiff's driver's license was valid. (Tr. 251-52, 314.)  CPD informed Officer

Lydon over the phone that the plaintiff's license was valid but there was an outstanding warrant for the plaintiff's arrest. (Tr. 261.)  Officer Lydon immediately informed Lieutenant Sangiorgi, who was functioning as Officer Lydon's direct supervisor at the time (Tr. 600), that the plaintiff was possibly the subject of an outstanding warrant.  (Tr. 262.) Lieutenant Sangiorgi assigned Sergeant Barry to assist Officer Lydon in arresting the plaintiff because Officer Lydon was inexperienced in processing arrests on the New Jersey side of the Bridge.  (Tr. 644, 890.)

Approximately two hours elapsed between the plaintiff's initial exchange with Officer Lydon upon entering the Station and the detention of the plaintiff in a holding cell at the Station.  (Tr. 83, 270.)  The plaintiff waited patiently for those two hours for the retrieval of his car.  (Tr. 83.)  During that time, CPD faxed to Officer Lydon a document confirming the information that CPD had conveyed over the phone regarding the "warrant hit."  (Tr. 272, 359-60.)  The document was a printout of the warrant (the "warrant printout") that resulted or "popped" from a computer search by CPD, using the plaintiff's name and date of birth, of a database of criminal history records maintained by DCJS.  (Tr. 272; Pl.'s Ex. 1.)[5]  The

_____

[5]     There was testimony at trial by Walter Signorelli, an expert witness who testified on behalf of the plaintiff, that the warrant printout was generated by the National Crime Information Center (the "NCIC")

warrant printout reflected a bench warrant for "John Doe" for a felony narcotics offense (Pl.'s Ex. 1), meaning that the identity of the subject of the warrant was uncertain and the subject of the warrant had not appeared for a scheduled court appearance in connection with that offense.  (Tr. 472.)  The warrant printout indicated that the bench warrant popped during the computer search because of a match in the criminal history records maintained by the DCJS between the plaintiff's name and date of birth and the bench warrant.  (Pl.'s Ex. 1.)[6]

The warrant printout indicated that the subject of the John Doe bench warrant was a black male, height five feet eight inches, weight 160 pounds, with black hair and dark skin.  The warrant printout gave John Doe's date of birth as September 25, 1981.  (Pl.'s Ex. 1.)  Officer Lydon understood from the warrant printout and the information conveyed verbally by CPD that the bench warrant was issued out of the Bronx for a felony narcotics offense.  (Pl.'s Ex. 1; Tr. 286-87.)  The warrant printout contained a docket number for the Bronx arrest that resulted in

_____

(characterized by Mr. Signorelli as the National Crime Intelligence Center).  (Tr. 471, 489.)  Whether the actual warrant printout document was generated by NCIC or DCJS is irrelevant.  The significant fact is that the warrant printout reflected that a bench warrant popped upon a search of criminal history records maintained by DCJS using the plaintiff's name and date of birth.

[6]     The warrant printout stated: "This suspect [John Doe] is based on a match between the following alias/DOB from his/her DCJS criminal history record and your inquiry data."  The inquiry data were the name "Joseph Caceres" and the date of birth September 11, 1976, which was Joseph Caceres' date of birth.  (Pl.'s Ex. 1.)

the issuance of the bench warrant.  (Pl.'s Ex. 1.)  The warrant
printout also contained a New York State Identification number
(a "NYSID" number) for John Doe.  (Pl.'s Ex. 1.)  The warrant
printout instructed the recipient to "contact the originating
agency to determine if the individual named [in the warrant
printout] is the same as the individual about whom you
inquired."  (Pl.'s Ex. 1.)  The originating agency was the New
York City Police Department (the "NYPD").  (Tr. 273; Pl.'s Ex.
1.)  The warrant printout stated that "the wanting agency has
indicated it will extradite throughout New York State and
outside the state."  (Pl.'s Ex. 1.)

     The plaintiff did not match the description of John Doe
provided in the warrant printout in several respects.  The
plaintiff is a light-skinned Hispanic, not black.  (Tr. 68.)  He
has never held himself out to be black and none of the
investigating officers concluded from his physical appearance
that he was black.  (Tr. 68-69, 274, 645-46.)  The investigating
officers also did not regard him as having dark skin.  (Tr.
646.)  The plaintiff was born on September 11, 1976 – a fact
reflected on his driver's license which he had already given to
Officer Lydon – not September 25, 1981.  (Tr. 68.)  The
plaintiff's height is five feet six inches, not five feet eight
inches.  (Pl.'s Ex. 3.)

Lieutenant Sangiorgi and Officer Lydon spoke to the plaintiff before he was placed in a holding cell at the Station. (Tr. 269, 672.)  In the course of those conversations, the plaintiff told Lieutenant Sangiorgi that he was not the subject of the John Doe bench warrant and that he had never been arrested in the Bronx.  (Tr. 672.)  The plaintiff also told Officer Lydon that he was not the subject of the bench warrant (Tr. 269), that he had never been arrested in the Bronx (Tr. 286-87), and that he had been confused with the subject of the same bench warrant before and the warrant was actually for a black male.  (Tr. 1478-79.)  The plaintiff did not tell the investigating officers that the warrant was for someone named Lacey Johnson.  (Tr. 1478-79.)  The investigating officers did not contact the NYPD to confirm that the plaintiff was the subject of the warrant.

The plaintiff was placed in a holding cell in the "arrest processing area" of the Station at 6:25 p.m. on August 4, 2006, after nearly two hours of waiting voluntarily and politely at the Station for the retrieval of his car.  (Tr. 269-70.)  In the holding cell the plaintiff was behind bars and he was not free to leave.  (Tr. 203-04.)  The decision to place the plaintiff in the holding cell was made by Lieutenant Sangiorgi.  (Tr. 644-45.)

The plaintiff was not in fact the subject of the John Doe bench warrant.  The reason the warrant popped during the computer search by CPD using the plaintiff's name and date of birth was that DCJS mistakenly assigned the plaintiff the same NYSID number as Lacey Johnson, an entirely separate individual who was the real subject of the bench warrant.  A NYSID number is a unique number that is assigned to an individual when he is fingerprinted and his fingerprints are sent to DCJS, which is the state repository for fingerprints in New York State.  Each NYSID number, like each person's fingerprints, is intended to be unique to that person.  In this case, due to a clerical error, two separate individuals – the plaintiff and Lacey Johnson – were assigned the same NYSID number.  (Tr. 877-85.)  New York State maintains a computerized database organized by NYSID number to track criminal suspects and arrestees.  (Tr. 487.)  An error in the NYSID database would also be reflected in the databases of criminal records maintained by DCJS and NCIC.  (Tr. 488-89.)  No witness at trial had any personal knowledge of any instance in which two separate individuals had ever before been assigned the same NYSID number.

As of August 4, 2004, the plaintiff had been confused with the subject of the same bench warrant and detained pursuant to that warrant by NYPD police officers on three prior occasions. (Tr. 157-72.) On each prior occasion, the plaintiff protested

that he was not the subject of the bench warrant, that he was
not Lacey Johnson, and that he had never been to the Bronx, but
the NYPD officers did not release him on the strength of those
protests and held him for a number of days.  (Tr. 171-72.)

Shortly after the plaintiff was placed behind bars in a
holding cell in the designated arrest area at the Station at
6:25 p.m.,  the investigating officers undertook various
measures to confirm that the plaintiff was the subject of the
John Doe bench warrant.[7]  (Tr. 908-12.)  First, the investigating
officers compared the warrant printout to a rap sheet for
"Joseph Caceres" that was faxed to the station by CPD at 6:35
p.m. (Pl.'s Ex. 3.)  The rap sheet was for "Joseph Caceres" and
identified Joseph Caceres' NYSID number as 8419918K, which was
the same NYSID number that was on the bench warrant reflected in
the warrant printout.  (Pl.'s Exs. 1, 3.)  The rap sheet
indicated that Joseph Caceres used the alias "Lacey Johnson."
(Pl.'s Ex. 3.)  The criminal history provided by the rap sheet
included an arrest in the Bronx on a felony narcotics charge.
(Pl.'s Ex. 3.)  The docket number listed on the rap sheet for
that Bronx arrest was 98X028370, the same docket number that was
on the bench warrant reflected in the warrant printout.  (Pl.'s

---

[7]    Sergeant Barry testified that these measures were taken before the
plaintiff was arrested.  (Tr. 908.)  However, Sergeant Barry also testified
that the plaintiff was already behind bars by the time he arrived at the
Station to assist in the arrest.  (Tr. 938.)  Moreover, the time of day
reflected on the documents reviewed by the officers reflects that they
arrived at the Station after 6:25 p.m.  (See Pl.'s Exs. 2, 3.)

Exs. 1, 3.)  The rap sheet indicated that a bench warrant had been issued in connection with that arrest on June 16, 1998 and again on April 10, 2000, returned on April 10, 2000, and reissued on September 3, 2003.  (Pl.'s Ex. 3.)  The rap sheet described Joseph Caceres as a Hispanic male, height five feet six inches, date of birth September 11, 1976.  (Pl.'s Ex. 3.) Officer Lydon, Officer Barry, and Lieutenant Sangiorgi each compared the information in the warrant printout to that in the rap sheet.  (Tr. 360.)

After comparing the warrant printout to the rap sheet, the investigating officers compared the warrant printout to another document faxed by CPD, at 6:34 p.m.  (Tr. 906-08; Pl.'s Ex. 2.) That document was an NCIC Interstate Identification Index Response resulting from a search for "Joseph Caceres" in the NCIC database (the "Index Response").  (Pl.'s Ex. 2.)  The Index Response provided a NYSID number for Joseph Caceres that was the same as the NYSID number provided in the bench warrant reflected in the warrant printout.  (Pl.'s Exs. 1, 2.)  However, the Index Response also stated that there were "no exact matches" in the NCIC database for "Joseph Caceres."  (Pl.'s Ex. 2.)  Moreover, the Index Response listed the plaintiff's race as white and his height as five feet seven inches.  (Pl.'s Ex. 2.)

After comparing the warrant printout to the Index Response, Lieutenant Sangiorgi obtained a mugshot of the plaintiff from

14

the most recent arrest of the plaintiff, which occurred in
Staten Island on August 28, 2003.  (Tr. 909-10.)  The mugshot
was a photograph of the plaintiff and contained the same NYSID
number that was listed on the bench warrant reflected in the
warrant printout.  (Tr. 909.)  The investigating officers did
not obtain a photograph of the person who had been arrested in
connection with the bench warrant – that is, they did not obtain
a mugshot from the Bronx arrest resulting in the issuance of the
bench warrant.  They could easily have obtained such a
photograph by calling the NYPD warrant squad, the Intercity
Correspondence Unit ("ICU"), or the NYPD 44th Precinct in the
Bronx. (Tr. 470.)  Proper police procedure would have entailed
obtaining that photograph in the course of verifying that the
plaintiff was in fact the subject of the bench warrant.  (Tr.
494, 782.)

The investigating officers also took the plaintiff's
fingerprints and submitted them to the Federal Bureau of
Investigation (the "FBI") for further identification
confirmation.  The FBI response indicated that the plaintiff was
Joseph Caceres and that Joseph Caceres had the same FBI number
that was listed on the rap sheet and the Index Response.  (Tr.
936.)

Later that night the investigating officers contacted the
Bergen County Municipal Court, and Bergen County Justice Robert

15

Tessaro came to the Station to conduct a probable cause determination in connection with the plaintiff's arrest and to bring the plaintiff before the court.  (Tr. 941-42, 1084-85.) In connection with this two-part judicial proceeding Lieutenant Sangiorgi and Officer Lydon prepared and signed a complaint-warrant form charging the plaintiff with being a fugitive from justice, namely, "enter[ing] the State of New Jersey while being wanted by the State of New York for a felony level narcotics crime . . . ."  (Pl.'s Ex. 13.)  Justice Tessaro arrived at the station and spoke with all three of the investigating officers about the case for approximately five minutes.  (Tr. 1088-89.) Justice Tessaro signed the complaint-warrant form and also signed a "Jail Commitment Form" authorizing the temporary commitment of the plaintiff to jail with bail to be set subsequently.  (Pl.'s Ex. 13.)  At approximately 9:20 p.m., the plaintiff was brought before Justice Tessaro for approximately five minutes.  (Tr. 614-15.)  Justice Tessaro explained to the plaintiff the charges against him.  (Tr. 946.)

Following the judicial proceeding, that same night, the plaintiff was taken to the Bergen County Correctional Facility. (Tr. 947.)  He remained in custody there until August 6, 2004.

On August 6, the plaintiff's father, Julio Caceres, went to the Station and spoke with Lieutenant Sangiorgi.  (Tr. 662.)  He explained that the plaintiff had been confused with Lacey

16

Johnson on the same bench warrant previously and he produced a letter from an attorney attesting to the fact that the plaintiff was not Lacey Johnson. (Tr. 663-64.) Following his exchange with the plaintiff's father, Lieutenant Sangiorgi faxed a request to ICU for a mug shot of Lacey Johnson from the Bronx arrest that resulted in the issuance of the John Doe bench warrant. (Pl.'s Ex. 16; Tr. 635-36, 667-68.) Lieutenant Sangiorgi also dispatched Officer Jason Malice to the 33rd Precinct to investigate whether the plaintiff was the subject of the John Doe bench warrant on which he was being held. (Tr. 788, 798-99.) At the 33rd Precinct, Officer Malice was given photographs of the person who was arrested in connection with the Bronx offense that gave rise to the issuance of the John Doe bench warrant. (Tr. 798-99.) The photographs were photographs of an individual named Lacey Johnson, who was plainly a separate individual from Joseph Caceres. (Tr. 796-98.) The NYSID number listed on the photographs was the same as the NYSID number listed on the warrant printout and the NYSID number listed on the plaintiff's rap sheet and the Index Response. (Pl.'s Exs. 1-3, 17, 19.) The photographs made it obvious that Lacey Johnson and the plaintiff were two separate people and that the plaintiff was not the subject of the bench warrant that had issued in connection with the Bronx Arrest. (Pl.'s Exs. 17-19.) The plaintiff was released from custody shortly thereafter, due

17

in large part to the efforts of Lieutenant Sangiorgi to ensure that the plaintiff was released as quickly as possible.


### III

The defendants move jointly for judgment as a matter of law pursuant to Rule 50 or, in the alternative, for a new trial pursuant to Rule 59 on the grounds that there was insufficient evidence for a reasonable jury to find that the defendants were liable for false arrest under federal or state law. Specifically, the defendants argue that no reasonable jury could have found that Lieutenant Sangiorgi lacked probable cause to arrest the plaintiff, or that in arresting the plaintiff he intentionally or recklessly deprived the plaintiff of his constitutional right not to be arrested without probable cause.


### A

The plaintiff brought his false arrest claims under both 42 U.S.C. § 1983 and New Jersey State law.  "In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004) (collecting cases); see also, e.g., Munoz v. City of New York, No. 04 Civ. 1105, 2008 WL 464236, at *4 (S.D.N.Y. Feb. 28, 2008) (applying state law to false arrest claim under § 1983 based on "Fourth

Amendment right to be free from unreasonable seizures, including arrest without probable cause"). Under New Jersey law, false arrest "is the constraint of the person without legal justification." Gibson v. Superintendent of NJ Dep't of Law and Public Safety Div. of State Police, 411 F.3d 427, 451 (3d Cir. 2005) (internal quotation marks omitted). An action for false arrest arises at the moment of an arrest, and subsequent events cannot legalize an arrest that was illegal when performed. See Bauer v. Borough of Cliffside Park, 541 A.2d 719, 723 (N.J. App. Div. 1988).

Whether an arrest is an illegal false arrest depends upon whether there was probable cause for the arrest. Probable cause is an absolute defense to a false arrest claim. Wildoner v. Borough of Ramsey, 744 A.2d 1146, 1154 (N.J. 2000). "Probable cause exists if at the time of the arrest 'the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.'" Id. (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)) (alterations omitted). Where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all, and thus the determination of whether an officer had probable cause to arrest a suspect is based on the collective knowledge of all of the

officers involved in the investigation so long as the various officers were in communication with each other.  See Illinois v. Andreas, 463 U.S. 765, 772 n.5 (1982).  Once the fact of a warrantless arrest has been established, the burden is on the arresting officer to prove probable cause for the arrest by a preponderance of the evidence.  See Patriz v. O'Neil, 577 F.2d 841, 849 n.9 (3d Cir. 1978) (collecting cases); Wilder v. Village of Amityville, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003).

In cases of an arrest based on mistaken identity, such as this case, the Supreme Court has instructed that the probable cause inquiry is whether it was reasonable to mistake the person arrested for the person sought, assuming there was probable cause to arrest the person sought.  See Hill v. California, 401 U.S. 797, 802-03 (1971); see also United States v. Valez, 796 F.2d 24, 26 (2d Cir. 1986) (holding that Hill "governs the law in cases where the person arrested turns out not to be the person sought"); Gonzalez v. City of New York, No. 98 Civ. 6081, 2002 WL 252564, at *5 (S.D.N.Y. Feb. 21, 2002); Ruiz v. Herrera, 745 F. Supp. 940, 947 (S.D.N.Y. 1991).

For purposes of his § 1983 claim, in addition to satisfying the state law requirements for proving a false arrest claim, the plaintiff must show that some person has deprived him of a federal right and that such person acted under color of state law.  See, e.g., Gomez v. Toledo, 446 U.S. 635, 640 (1980).

There is no dispute that the right not to be arrested without probable cause is a federal constitutional right protected by the Fourth Amendment.  See, e.g., Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000).  Similarly, there is no dispute that Lieutenant Sangiorgi arrested the plaintiff and that he did so under color of state law.

The only disputed issue on the defendants' joint motion concerning both the § 1983 claim and the state law claim is whether Lieutenant Sangiorgi had probable cause to arrest the plaintiff.

B

The evidence at trial was sufficient to support the jury's finding that the defendants were liable for false arrest.

The jury could reasonably have concluded that Lieutenant Sangiorgi lacked probable cause to arrest the plaintiff.  The plaintiff was placed in a holding cell behind bars in an area of the Station designated as the "arrest area" at 6:25 p.m. on August 4, 2004.  With the exception of the warrant printout, every document reviewed by the investigating officers in connection with the decision to arrest the plaintiff was reviewed after the plaintiff had already been placed in the holding cell.  Those documents include the plaintiff's rap sheet, the Index Response from NCIC, and the plaintiff's mugshot

from his 2003 arrest in Staten Island.  Thus any conclusions
drawn from the comparison of the warrant printout to those
documents - including the fact that the NYSID number assigned to
John Doe was the same as the NYSID number assigned to Joseph
Caceres - did not contribute to the decision to place the
plaintiff in the holding cell.  Similarly, the fingerprint check
with the FBI occurred after the plaintiff was already behind
bars and could not have contributed to the decision to place him
in the holding cell.

The placement of the plaintiff in the holding cell at 6:25
p.m. plainly constituted an arrest for purposes of the
plaintiff's false arrest claim, and the defendants have not
argued otherwise in the current motions.  The plaintiff was
placed in a cell behind bars in the area of the Station
designated as the "arrest area."  He was not free to leave the
cell.  A formal arrest is not necessary to constitute an arrest
under the Fourth Amendment.  See, e.g., State v. Basil, No. 05-
04-592, 2009 WL 1174777, at *3 (N.J. App. Div. May 4, 2009) (per
curiam); Lucas v. Galloway Twp. Police Dept., No. 05 Civ. 3346,
2007 WL 1797659, at *9 (D.N.J. June 20, 2007) ("All that is
required for an arrest is that a reasonable person believes that
they are not free to leave a particular location or otherwise
terminate an encounter with police.") (internal quotation marks
and alterations omitted); see also Posr v. Doherty, 944 F.2d 91,

22

96, 98 (2d Cir. 1991); <u>Brewton v. City of New York</u>, 550 F. Supp. 2d 355, 365 (E.D.N.Y. 2008) ("[T]he Court's first task is to determine whether the 'arrest' took place for purposes of [the plaintiff's] false arrest claims . . . . If a reasonable person would not feel free to leave police custody, an arrest has likely occurred.").

The defendants attempt to avoid the conclusion that the arrest of the plaintiff rested solely on the warrant printout by urging the Court to infer that in the two hours that elapsed between the plaintiff's arrival at the Station and his arrest, the investigating officers received verbally over the phone the substance of the various documents that were not sent to the Station until after the arrest.[8]  On a Rule 50 motion all reasonable inferences are drawn in the nonmoving party's favor. There is no evidence that the investigating officers verbally received the substance of the post-arrest documents before the arrest, and there is nothing to preclude an inference in favor of the nonmoving party that they did not.

The jury could reasonably find that the warrant printout, coupled with the investigating officers' pre-arrest interactions with the plaintiff, did not amount to probable cause to arrest the plaintiff.  The bench warrant reflected in the warrant

---

[8]    It should be noted that the defendants did not raise this argument at trial or in their post-trial motion papers, but only at oral argument of the post-trial motions.  (Rule 50 Tr. 39.)

printout did not identify the name of the wanted suspect, and
described a person who differed in race, complexion, height, and
date of birth from the plaintiff.  None of the investigating
officers thought that the plaintiff resembled a black male with
dark skin, which was the description of the suspect's race and
complexion provided in the warrant printout.  Against the
background of these discrepancies in race, complexion, height,
and date of birth, the plaintiff insisted to the investigating
officers that he was not the subject of the John Doe bench
warrant, that he had been mistaken for the subject of the same
bench warrant before, that he had never been arrested in the
Bronx, and that the bench warrant was for a black person.  The
jury was justified in finding that on the basis of this
information it was unreasonable for Lieutenant Sangiorgi to
mistake the plaintiff for the subject of the John Doe bench
warrant.  See Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir.
1994) ("The issue of probable cause . . . was predominantly
factual in nature [and was] properly presented to the jury.").

    The lack of physical resemblance between the plaintiff and
the subject described in the warrant printout – particularly the
racial discrepancy, which was noticed by the investigating
officers and which was a source of significant concern to them –
distinguishes this case from other cases where courts have held
arrests based on mistaken identity to be supported by probable

cause as a matter of law.  Cf. Hill, 401 U.S. at 802-04 (finding
mistake in identifying suspect reasonable despite protests of
mistaken identity where arrestee "fit the description of [the
suspect] received from various sources," answered the door to
suspect's apartment and could not credibly explain his presence
there, and denied knowledge of firearms in the apartment which
were in plain view); Gonzales, 2002 WL 252564, at *5-6 (finding
"ample cause" for arrest based on mistaken identity where
"[b]efore arresting the plaintiff, it is undisputed that the
defendant officers had information showing that plaintiff's name
was one of aliases used by the fugitive [for whom he was
mistaken], that their birth dates matched, and that the driver's
license photograph of [the plaintiff] appeared to match the case
file photograph of [the actual fugitive]," and where the
plaintiff and the actual fugitive bore a "striking similarity in
appearance" to one another); cf. also Rodriguez v. Farrell, 280
F.3d 1341, 1347-48 (11th Cir. 2002) (holding that mistake in
identifying suspect was reasonable where arrestee and actual
suspect had same name and race, among other things, but 5-inch
difference in height); United States v. Zipperian, 977 F.2d 594,
at *1-2 (9th Cir. Sept. 29, 1992) (upholding district court's
finding that mistake in identifying suspect was reasonable
despite differences in height and skin tone on account of
"physical similarities between [arrestee and actual suspect],"

including same race, and suspicious conduct by arrestee, among other things).  The unsuspicious nature of the plaintiff's conduct, which consisted of coming to the Station of his own accord and waiting politely and cooperatively for two hours of his own free will, also distinguishes this case from others finding mistakes in identifying suspects reasonable.  Cf. Hill, 401 U.S. at 802-03; Zipperian, 977 F.2d at *2.

The defendants point to the historic reliability of the NYSID system, which was established at trial, as proof that it was reasonable for Lieutenant Sangiorgi to mistake the plaintiff for the subject of the bench warrant.  This argument has some force in view of the fact that the warrant was produced from the DCJS database, on the basis of the plaintiff's name and date of birth, and this system depends on the historically reliable NYSID numbers.  However, this argument is somewhat weakened by the fact that the officers did not receive the documents containing the plaintiff's NYSID number – the rap sheet, the Index Response, and the mugshot from the 2003 Staten Island arrest – until shortly after they had already arrested the plaintiff.  At the time of the arrest they had only the warrant printout, which provided a NYSID number for John Doe; they did not have documentation of the plaintiff's NYSID number with which to compare the NYSID number listed on the warrant printout.

26

In this case, the investigating officers' personal observations of the plaintiff's appearance directly contradicted the information in the warrant printout, particularly with respect to race. Moreover, the plaintiff provided relatively detailed information reinforcing that he was not the person described in the warrant printout – namely, that the bench warrant reflected in the warrant printout was for a black person, that he had been confused with the subject of the same bench warrant before, and that he had never been arrested in the Bronx. The jury was entitled to find that Lieutenant Sangiorgi lacked probable cause to arrest the plaintiff in light of his own observation that the plaintiff did not resemble the subject described in the warrant printout, coupled with the plaintiff's protests, which also underscored the racial discrepancy.

The defendants also point to the fingerprint check conducted by the FBI and to the match between the mugshot from the August 28, 2003 Staten Island arrest and the plaintiff's physical appearance as proof that it was reasonable to mistake the plaintiff for the person described in the warrant printout. However, this evidence is irrelevant to the probable cause inquiry because it was obtained after the plaintiff had already been arrested. In any event, this evidence would not undermine the jury's conclusion that there was no probable cause to arrest the plaintiff. The fingerprint check involved taking the

plaintiff's fingerprints, sending them to the FBI, and receiving confirmation that the fingerprints belonged to Joseph Caceres. That only confirmed that the plaintiff was Joseph Caceres.  It shed no light on whether the plaintiff was John Doe, the subject described in the warrant printout.  Similarly, the mugshot from the Staten Island arrest only confirmed that the plaintiff was Joseph Caceres, who was arrested in Staten Island on August 28, 2003.  It too shed no light on whether the plaintiff was John Doe.  The mugshot from the Bronx arrest resulting in the bench warrant would have shown whether the plaintiff was John Doe, but the investigating officers failed to request that photograph until August 6, 2004.

Therefore, the jury could reasonably find that Lieutenant Sangiorgi lacked probable cause to arrest the plaintiff.[9]

C

The defendants also contend that the jury erred in finding Lieutenant Sangiorgi liable for a violation of § 1983 because he did not intentionally or recklessly deprive the plaintiff of his

---

[9]     The defendants do not seek to rely on the alleged finding of probable cause by Justice Tessaro to argue that Lieutenant Sangiorgi had probable cause to arrest the plaintiff at 6:25 p.m.  (See Rule 50 Tr. 11.)  Justice Tessaro's alleged determination of probable cause came after the plaintiff had already been arrested and thus did not itself contribute to the circumstances on which Lieutenant Sangiorgi could have relied at the time of the arrest.  Any finding of probable cause by Justice Tessaro was merely evidential, see, e.g., Zalewski v. Gallagher, 375 A.2d 1195, 1199 (N.J. App. Div. 1977), and the jury could accord it whatever weight they felt it warranted.

constitutional right not to be arrested without probable cause.[10]
The defendants argue that the jury could not reasonably have
found that Lieutenant Sangiorgi subjectively thought there was
no probable cause or was recklessly indifferent to whether there
was probable cause.  However, the intentional or reckless state
of mind required for a violation of § 1983 based on false arrest
is the intentional or reckless conduct of arresting the
plaintiff where, under the totality of the circumstances, there
is no probable cause to arrest.  The question of the existence
of probable cause is an objective, factual question.  See
Iacobucci v. Boulter, 193 F.3d 14, 26 (1st Cir. 1999) ("The state
of mind required to make out a cognizable section 1983 claim (at
least one grounded in false arrest) . . . relates only to the
conduct, not to the consequence; that is, it entails an intent
to do the act, not to effect a civil rights violation."); Mosley
v. Wilson, 102 F.3d 85, 94-95 (3d Cir. 1996); see also McMillan
v. City of New York, No. 03 Civ. 626, 2009 WL 261478, at *7
(E.D.N.Y. Feb. 4, 2009) ("An arresting officer's 'state of mind'
and the officer's subjective reason for making the arrest are,
therefore, irrelevant to a probable cause determination.").

---

[10]     This argument relates solely to Lieutenant Sangiorgi's personal
liability for a violation of § 1983.  This argument would not affect
Lieutenant Sangiorgi's liability for false arrest under New Jersey State law
or the vicarious liability of the Port Authority for the false arrest claims
under New Jersey law.  The Port Authority is not liable for the § 1983 claim
because the jury found that the Port Authority was not liable for a failure
to train claim, the only basis on which the plaintiff sought to hold the Port
Authority liable under § 1983.  See City of Canton v. Harris, 489 U.S. 378,
388-89 (1989); Wray v. City of New York, 490 F.3d 189, 195-96 (2d Cir. 2007).

Because there is no dispute that Lieutenant Sangiorgi intentionally caused the plaintiff's arrest, and because the jury could reasonably have found that probable cause was lacking and that Lieutenant Sangiorgi was acting under color of state law, the jury could reasonably have found Lieutenant Sangiorgi violated § 1983.[11]

In sum, the jury could reasonably have concluded that Lieutenant Sangiorgi arrested the plaintiff without probable cause. Lieutenant Sangiorgi arrested the plaintiff despite discrepancies between his own observation of the plaintiff and the description provided in the warrant printout. There is no basis for the Court to vacate the jury's finding that the defendants are liable for falsely arresting the plaintiff. Therefore, the defendants' joint motion for judgment as a matter of law pursuant to Rule 50 is **denied**. Because, for the reasons explained above, the Court does not believe that the jury

---

[11]    The Court instructed the jury that to establish a violation of § 1983, "the plaintiff must show that any conduct by the officer . . . consisting of false arrest . . . was done with an intent to deprive the plaintiff of his rights or with reckless indifference to those rights." (Tr. 1352.) See Hon. Leonard Sand, et al., Modern Federal Jury Instructions 87-75. In the context of a claim of false arrest this placed a greater burden on the plaintiff than proving that the defendants intentionally or recklessly arrested the plaintiff without probable cause. However, there was no objection to the charge and the defendants cannot complain about a charge which was more favorable to them than warranted.

       If the plaintiff were required to prove a subjective state of mind of Lieutenant Sangiorgi which indicated that he was recklessly indifferent to whether there was probable cause, there was in fact sufficient evidence. The jury, for example, could have relied on the fact that Lieutenant Sangiorgi had a "big concern" with respect to whether the plaintiff was the subject of the warrant. (Tr. 709.) He also testified that the fingerprints overrode any discrepancy (Tr. 709), but the fingerprints were only obtained after the plaintiff was arrested.

reached a "seriously erroneous result or that the verdict is a miscarriage of justice," Patrolmen's Benevolent Ass'n of the City of New York v. The City of New York, 310 F.3d 43, 54 (2d Cir. 2002), the defendants' joint motion in the alternative for a new trial pursuant to Rule 59 is also **denied.**


IV

     Lieutenant Sangiorgi moves separately for judgment as a matter of law based on qualified immunity.


A

     Qualified immunity shields government officials performing discretionary functions, such as arrests, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see, e.g., Ashcroft v. Iqbal, 129 S. Ct. 1937, 1945-46 (2009).  In order to overcome a qualified immunity defense, a plaintiff must show both that "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show that the officer's conduct violated a constitutional right," and that the right allegedly violated was

"clearly established."[12]   Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson v. Callahan, 129 S. Ct. 808 (2009).  The Supreme Court has recently instructed that the order in which a court determines whether the plaintiff has made these two showings, each of which is a threshold requirement to overcome a qualified immunity defense, is within the sound discretion of the court.  See Pearson, 129 S. Ct. at 818.

     Notwithstanding the violation of a clearly established constitutional or statutory right, in the case of an arrest an officer may still establish qualified immunity under federal law by showing either that "it was objectively reasonable for the officer to believe that probable cause existed," or that "officers of reasonable competence could disagree on whether the probable cause test was met."  Robinson v. Via, 821 F.2d 913, 921 (2d Cir. 1987); see also Walczyk v. Rio, 496 F.3d 139, 163 (2d Cir. 2007) (defining "arguable probable cause" to mean "either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met") (internal quotation marks omitted); Rogers v. City of Amsterdam, 303 F.3d 155, 158 (2d Cir. 2002); Connor

---

[12]    A right that is "clearly established" is one "of which a reasonable person would have known."  Harlow, 457 U.S. at 818.

v. Powell, 744 A.2d 1158, 1164 (N.J. 2000). "Normally, it is only the 'plainly incompetent or those who knowingly violate the law' – those who are not worthy of the mantle of office – who are precluded from claiming the protection of qualified immunity." Moore v. Andreno, 505 F.3d 203, 214 (2d Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

The plaintiff agrees that a law enforcement officer is entitled to qualified immunity under New Jersey law for a claim of false arrest where the officer's actions were objectively reasonable. See DelaCruz v. Borough of Hillsdale, 870 A.2d 259, 271 (N.J. 2005). The plaintiff also agrees that this standard is the same under state law and federal law. See id.

In this case, the jury found that Lieutenant Sangiorgi violated the plaintiff's constitutional right not to be arrested without probable cause, and as explained above, there is no basis to vacate that finding. Moreover, there is no dispute that the right not to be arrested without probable cause is clearly established. See, e.g., Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000). Therefore, the only issue is whether Lieutenant Sangiorgi is entitled to qualified immunity notwithstanding his violation of the plaintiff's clearly established constitutional right – that is, whether Lieutenant Sangiorgi's conduct was objectively reasonable. That issue must be decided on an objective basis without regard to Lieutenant

33

Sangiorgi's subjective belief as to whether there was probable
cause to arrest the plaintiff.  See Zellner v. Summerlin, 494
F.3d 344, 367 (2d Cir. 2007) ("The qualified immunity test is an
objective one."); DelaCruz, 870 A.2d at 271.

     "Once the jury has resolved any disputed facts that are
material to the qualified immunity issue, the ultimate
determination of whether the officer's conduct was objectively
reasonable is to be made by the court."  Zellner, 494 F.3d at
368.  Because qualified immunity is an affirmative defense,
"[t]o the extent that a particular finding of fact is essential
to a determination by the court that the defendant is entitled
to qualified immunity, it is the responsibility of the defendant
to request that the jury be asked the pertinent question."  Id.
During the trial, the Court received submissions of proposed
interrogatories to the jury in connection with qualified
immunity from both Lieutenant Sangiorgi and the plaintiff.  The
Court formulated three interrogatories based on the suggestions
of Lieutenant Sangiorgi and the plaintiff, and both parties
agreed to the submission of those three interrogatories to the
jury after the jury returned a verdict.

     The first interrogatory asked whether the jury found "that
the plaintiff told any of the individual officer defendants that
the John Doe bench warrant was for someone named Lacey Johnson?"
(Interrogatory (a).)  The jury found that the answer was "No"

with respect to each investigating officer – that is, the plaintiff told none of the officers that the bench warrant was for someone named Lacey Johnson.  The second interrogatory asked whether the jury found "that the plaintiff told any of the individual officer defendants that the John Doe bench warrant was for a black person?"  (Interrogatory (b).)  The jury found that the answer was "No" for Lieutenant Sangiorgi and "Yes" for Sergeant Barry and Officer Lydon – that is, the plaintiff told Sergeant Barry and Officer Lydon, but not Lieutenant Sangiorgi, that the bench warrant was for a black person.  The third interrogatory asked whether the jury found "that the plaintiff told any of the individual officer defendants that he had been confused with the subject of the same John Doe bench warrant before?"  (Interrogatory (c).)  The jury found that the answer was "No" for Lieutenant Sangiorgi and "yes" for Sergeant Barry and Officer Lydon – that is, the plaintiff told Sergeant Barry and Officer Lydon, but not Lieutenant Sangiorgi, that he had been confused with the subject of the same bench warrant before.

B

Lieutenant Sangiorgi is entitled to qualified immunity in connection with the false arrest claims against him under both federal and state law.  Although there is no basis to vacate the jury's finding that Lieutenant Sangiorgi acted unreasonably in

35

mistaking the plaintiff for the subject of the John Doe bench
warrant reflected in the warrant printout, police officers of
reasonable competence could disagree as to whether there was
probable cause to arrest the plaintiff at 6:25 p.m. on August 4,
2004.

Lieutenant Sangiorgi arrested the plaintiff on the strength
of information communicated verbally by CPD and confirmed in the
documentation of the warrant printout that a computer search of
the criminal history records maintained by DCJS using the
plaintiff's name and date of birth yielded an outstanding felony
narcotics warrant.  Reliance on comparable sources of
information has been held to justify the protection of qualified
immunity.  See Muhammad v. City of Peekskill, No. 06 Civ. 1899,
2008 WL 4525367, at *6 (S.D.N.Y. Sept. 30, 2008) (granting
qualified immunity in false arrest action where officers
arrested plaintiff for driving with suspended registration based
on information in Department of Motor Vehicles ("DMV") database,
despite plaintiff's protestations of innocence and proffer of
unexpired registration and insurance card, and finding that
"[w]hether the DMV database was accurate is immaterial . . . .
[T]he officers are plainly entitled to qualified immunity – even
if probable cause was lacking because of an error in the records
that was the fault of the system.") (internal quotation marks
omitted); Mayer v. City of New Rochelle, No. 01 Civ. 4443, 2003

WL 21222515, at *5 (S.D.N.Y. May 27, 2003) (granting qualified immunity in false arrest action where arrest was based on NYSPIN records that turned out to be inaccurate and where plaintiff presented conflicting information to the arresting officers).

It is significant that the warrant printout indicated that the outstanding warrant was for a felony offense and that "the wanting agency has indicated it will extradite throughout New York State and outside the state." (Pl.'s Ex. 1.) "[Q]ualified immunity is a doctrine of practical application to real-life situations at the time the government conduct occurred." Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001) (internal quotation marks omitted). At the time the arrest occurred, the alternative to detaining the plaintiff was to run the risk that he would leave the Station, because at that point he was waiting at the Station voluntarily for the retrieval of his car. That risk was weightier due to the serious nature of the offense and the importance of the offense to New York State, which was reflected in the wanting agency's willingness to extradite.

The discrepancies between the plaintiff and the description provided in the warrant printout – especially the racial discrepancy – militated against the reasonableness of mistaking the plaintiff for the subject of the John Doe bench warrant. But these discrepancies only signified that there was either an

37

error in the criminal records database maintained by DCJS,
meaning that the bench warrant was linked to the plaintiff by
mistake, or there was an error in the description provided in
the bench warrant, meaning that the bench warrant was correctly
linked to the plaintiff in the DCJS database.  It was not
objectively unreasonable to act upon the latter of the two
possibilities before investigating further,[13] particularly
because the warrant was for a felony offense and indicated that
the subject of the warrant would be extradited, and the
alternative to detaining the plaintiff was to run the risk that
he would leave the Station.[14]  Qualified immunity is not
precluded by the presence of information that directly conflicts
with the source of information on which an arresting officer
relies, including a government database.  See Palmer v. Town of
Jonesborough, No. 08 Civ. 345, 2009 WL 1255780, at *7 (E.D.
Tenn. May 1, 2009) (granting qualified immunity in false arrest
action where plaintiff was arrested for stealing vehicle listed
on NCIC as stolen, despite fact that he was able to produce

---

[13]     The plaintiff argues that the testimony elicited at trial shows that
neither Lieutenant Sangiorgi nor any of the investigating officers actually
thought that the physical description provided in the warrant confirmation
was erroneous.  Whatever the truth of that assertion, it is irrelevant
because the qualified immunity inquiry is an objective one.  The relevant
question for purposes of the qualified immunity analysis is whether it was
objectively reasonable for Lieutenant Sangiorgi to believe that the
description in the warrant printout, rather than the information in the
database, was erroneous – not whether he actually thought so.
[14]     As noted above, the subsequent investigation largely failed to confirm
that the plaintiff was the subject of the bench warrant in any event, and
thus even had it occurred before the arrest took place it would not affect
the qualified immunity analysis.

title to vehicle to arresting officers; court noted that
officers could have inferred that signature conferring title to
vehicle was forged); cf. Lewis v. City of Mount Vernon, Mount
Vernon Police Dept., 984 F. Supp. 748, 756 (S.D.N.Y. 1997)
(granting qualified immunity to officers who continued to
execute search pursuant to warrant despite noticing significant
discrepancies between premises being searched and premises
described in warrant).

The plaintiff argues that Lieutenant Sangiorgi should have
obtained a photograph of the person arrested in connection with
the Bronx offense for which the John Doe bench warrant was
issued before arresting the plaintiff.  There was testimony at
trial that Lieutenant Sangiorgi could have and should have
obtained such a photograph pursuant to proper police procedure,
and such a photograph ultimately revealed that the plaintiff was
not the subject of the bench warrant.  However, qualified
immunity may apply even where proper police procedure was not
followed.  See Lamont v. New Jersey, No. 04-2476, 2009 WL
483899, at *5-6 (D.N.J. Feb. 25, 2009) (citing Young v. City of
Killeen, Tex., 775 F.2d 1349 (5th Cir. 1985)).  Qualified
immunity turns on whether "there was arguable probable cause at
the time of arrest," Jenkins v. City of New York, 478 F.3d 76,
87 (2d Cir. 2007), and if the information before an officer did
constitute arguable probable cause, the officer's failure to

take further investigative steps to confirm the validity of the arrest does not affect the qualified immunity inquiry.  See Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997) (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The absence of a confirmatory photograph would not preclude officers of reasonable competence from disagreeing as to whether the information before Lieutenant Sangiorgi at the time of the arrest constituted probable cause for the arrest.  Cf. Brown v. Wiita, 7 Fed. Appx. 275 (4th Cir. 2001) (reversing denial of summary judgment on qualified immunity grounds in false arrest case where arresting officer failed to wait for DMV photograph that would have exonerated plaintiff on mistaken identity grounds).  Therefore, the fact that Lieutenant Sangiorgi could have requested a photograph from the Bronx arrest, and the photograph would have been salient in determining whether the plaintiff was the subject of the John Doe bench warrant, does not undermine Lieutenant Sangiorgi's entitlement to qualified immunity.

The plaintiff's protests of mistaken identity at the time of his arrest, although relatively detailed, similarly do not undermine Lieutenant Sangiorgi's entitlement to qualified immunity.  The plaintiff told the investigating officers that he was not the subject of the John Doe bench warrant, that he had been mistaken for the subject of the same bench warrant before,

that he had never been arrested in the Bronx, and that the bench warrant was for a black person.  However, the Supreme Court has instructed that protestations of mistaken identity, and even the production of identification to support such protestations, may not be persuasive.  See Hill, 401 U.S. at 803 ("[The arrestee] claimed he was Miller, not Hill.  But aliases and false identifications are not uncommon.").  Moreover, the jury found that the plaintiff never told the officers that the bench warrant was for someone named Lacey Johnson.  (See Special Interrogatory (a).)  This factual finding distinguishes the present posture of the qualified immunity inquiry from the posture of that inquiry at the summary judgment stage, where the Court denied summary judgment on the basis of qualified immunity in part because there was a question of fact as to whether the plaintiff told the investigating officers that the subject of the bench warrant was someone named Lacey Johnson.  See Caceres v. Port Auth. of New York and New Jersey, No. 06 Civ. 1558, 2008 WL 4386851, at *6 (S.D.N.Y. Sept. 24, 2008) ("Indeed, the plaintiff alleges that he provided the police with specifics that Lacey Johnson was the subject of the warrant and that he had been confused with Lacey Johnson in the past.").

The evidence developed at trial also established that as of August 4, 2004, the plaintiff had been confused with the subject of the same John Doe bench warrant and detained pursuant to that

warrant by NYPD police officers on three prior occasions.
Although, as the plaintiff points out, the details of those
incidents are not in the trial record, there was undisputed
evidence at trial that on each prior occasion, the plaintiff
protested that he was not the subject of the bench warrant, that
he was not Lacey Johnson, and that he had never been to the
Bronx, but the police did not release him on the strength of
those protests and held him for a number of days.  That prior
history, to which the plaintiff himself testified at trial,
supports the conclusion that, at the very least, reasonable
police officers could disagree as to whether the bench warrant
associated with the plaintiff's name provided probable cause to
arrest the plaintiff.

Finally, the plaintiff argues that Lieutenant Sangiorgi is
not entitled to qualified immunity because he did not present
evidence to counter the expert testimony offered by the
plaintiff.  The plaintiff argues that the expert testimony of
Mr. Signorelli established a standard of reasonable competence
that was not rebutted by any lay or expert testimony offered by
Lieutenant Sangiorgi, and because Lieutenant Sangiorgi's actions
at the time of the arrest did not satisfy the standard set forth
by Mr. Signorelli, Lieutenant Sangiorgi is not entitled to
qualified immunity.  That argument is without merit.  Although
qualified immunity is a mixed question of law and fact, <u>see</u>

42

Zellner, 494 F.3d at 368, "the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court." Id. Mr. Signorelli was not competent to testify to that ultimate determination. Cf. Rizzo v. Edison, Inc., 172 Fed. Appx. 391, at *3 (2d Cir. Mar. 24, 2006) (upholding district court rejection of "expert opinion testimony on whether the police investigation was adequate to establish probable cause"). To the extent Mr. Signorelli's testimony reflected his opinion that Lieutenant Sangiorgi's actions did not conform to proper police procedure, that opinion is not dispositive of the qualified immunity defense because, as explained above, proper procedures are not dispositive of the qualified immunity defense. The doctrine of qualified immunity protects all but the plainly incompetent, not merely all who follow proper police procedure to the letter.

In sum, although a rational jury could find that Lieutenant Sangiorgi lacked probable cause and should not have arrested the plaintiff, Lieutenant Sangiorgi's judgment was not so flawed that no reasonable officer would have made a similar choice. See Guerrero v. Scarazzini, 274 Fed. Appx. 11, at *2 (2d Cir. Feb. 23, 2008) (reversing denial of summary judgment based on qualified immunity in false arrest case where, among other things, NYPD database indicated that vehicle associated with suspect was registered to plaintiff). Lieutenant Sangiorgi is

entitled to qualified immunity on the false arrest claims against him.  The motion for judgment as a matter of law based on qualified immunity is **granted.**

### CONCLUSION

For all of the reasons explained above, the defendants' joint motion for judgment as a matter of law under Rule 50 or, in the alternative, for a new trial under Rule 59 is **denied**. Lieutenant Sangiorgi's separate motion for judgment as a matter of law based on qualified immunity is **granted**.  The Port Authority remains vicariously liable in the amount of $10,000 on the state law false arrest claim against it.  The Port Authority's liability on that claim is the only liability remaining in this action.  The Clerk is directed to enter judgment accordingly, to close Docket No. 77, and to close this case.

**SO ORDERED**

Dated: New York, New York
June 19, 2009

John G. Koeltl
United States District Court Judge

44